2010 UT 18

STATE of Utah, Plaintiff and Petitioner,

v.

Luke Zachary BAKER, Defendant and Respondent.

No. 20080351.

Supreme Court of Utah.

March 12, 2010.

Mark Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Aaron P. Dodd, Provo, for defendant.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Defendant Luke Zachary Baker entered a conditional guilty plea to possession of methamphetamine and drug paraphernalia in a drug free zone in violation of Utah Code section 58–37–8. Mr. Baker was the passenger in a vehicle that was stopped for a broken taillight. He claims that the police exceeded the permissible length and scope of the stop when they conducted a dog sniff on the car and then ordered him out of the car and searched him. He moved to suppress the drugs and drug paraphernalia obtained during the search of his person. The district court denied his motion to suppress, but the court of appeals reversed.

¶ 2 We granted certiorari to review the court of appeals' decision on two issues: first, whether the court of appeals erred in its construction or application of the Fourth Amendment to the United States Constitution as to the permissible length and scope of detention of the passengers in a vehicle that police have stopped; and second, whether the court of appeals erred in its construction or application of the Fourth Amendment relating to the circumstances under which searches for weapons may be conducted. Although we conclude that the officers improperly extended the duration of the stop by having a drug dog sniff the perimeter of the vehicle, we hold that the evidence should not be excluded on this basis because the officers relied in good-faith on settled judicial precedent when they conducted the dog sniff. However, we also conclude that the officers did not have an objectively reasonable belief that Mr. Baker was armed and dangerous at the time they frisked him and discovered the drugs and drug paraphernalia that were the subject of the motion to suppress. We therefore affirm the court of appeals.

## BACKGROUND

¶ 3 Sometime after midnight on January 30, 2005, Officer Raymond Robertson of the Pleasant Grove Police Department stopped the car in which Mr. Baker was a backseat passenger because it had no light illuminating the back license plate. Upon a records search of the driver's identification, Officer Robertson discovered that her driver license had been suspended for a drug violation. He then called for a K–9 unit and arrested the driver for driving on a suspended license.

¶ 4 While Officer Robertson was placing the driver under arrest, two other officers, Officer Mike Bartell and Officer Chris Rockwood, arrived as backup. Officer Bartell made contact with the passengers in the vehicle. The middle backseat passenger, not Mr. Baker, immediately advised the officer that he had a knife and handed it over to

Officer Bartell for the duration of the stop. Officer Bartell asked if there were any other knives or weapons in the vehicle. The four passengers proceeded to give him twelve other knives, including pocket knives and small throwing knives. Officer Bartell confiscated the knives, left the passengers in the car, and waited for the K–9 unit to arrive. Officer Bartell considered the passengers to be non-threatening and cooperative.

¶ 5 Officer Robertson estimates that twelve minutes elapsed between the time when he initially placed the driver under arrest and the arrival of the K–9 unit. He estimates that he had finished searching the driver incident to arrest and had placed her in the back of the patrol car about a minute before the K–9 unit arrived. When Officer Lopez, the K–9 officer, arrived and walked his dog around the car, the dog indicated the presence of drugs on the rear driver's side door handle and on the trunk. Officer Robertson and the two assisting officers then ordered the passengers out of the car and frisked them. When Officer Rockwood frisked Mr. Baker, he discovered a marijuana pipe. During booking, officers also discovered a small bag of methamphetamine in his possession. At the preliminary hearing, Officer Robertson testified that he did not fear for his safety at the time he authorized Officer Rockwood to frisk the passengers.

¶ 6 As part of his defense, Mr. Baker moved to suppress the marijuana pipe and the bag of methamphetamine that the officers found in his possession. Officers Bartell, Rockwood, and Robertson all testified at the motion hearing. Officer Bartell testified that the passengers cooperated with him when they offered him their knives and that they did nothing to make him fear for his safety. Although he testified that all the passengers gave him knives, and that some were pocket knives, while others were larger, he did not identify what type of knife or knives Mr. Baker gave him. Officer Rockwood testified that he frisked Mr. Baker because the K–9 unit indicated on the vehicle and "because on any traffic stop a police officer is always aware of officer safety." But Officer Robertson agreed that "in this particular case the reason that [he] decided

to search Mr. Baker was not because [he] was afraid for [his] safety." After the district court denied his motion to suppress the evidence, Mr. Baker entered a conditional guilty plea. The court of appeals reversed the district court, and we granted certiorari. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(a).

## STANDARD OF REVIEW

¶ 7 On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law. *Thomas v. Color Country Mgmt.*, 2004 UT 12, ¶ 9, 84 P.3d 1201. When reviewing a district court's denial of a motion to suppress, the appellate court disturbs the district court's findings of fact only when they are clearly erroneous. *State v. Worwood*, 2007 UT 47, ¶ 12, 164 P.3d 397. The appellate court reviews the district court's legal conclusions for correctness. *Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699. "When a case involves the reasonableness of a search and seizure, we afford little discretion to the district court because there must be state-wide standards that guide law enforcement and prosecutorial officials." *State v. Warren*, 2003 UT 36, ¶ 12, 78 P.3d 590 (internal quotation marks omitted); *see also Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699, (noting that we afford no deference to the district court's "application of law to the underlying factual findings in search and seizure cases").

## ANALYSIS

¶ 8 The State argues that the court of appeals erred in its construction of the Fourth Amendment when it reversed the district court's denial of Mr. Baker's motion to suppress. The court of appeals held that the officers impermissibly extended the duration of the stop for the twelve minutes between the arrest of the driver and the arrival of the K–9 unit. *State v. Baker*, 2008 UT App 115, ¶ 12, 182 P.3d 935. It further held that concern for officer safety did not provide an alternative justification for the stop because *"in this particular situation,* the mere presence of the knives, which had been confiscated at the time the officers decided to search the passengers," did not provide the

officers with reasonable suspicion that the passengers were "armed and presently dangerous." *Id.* ¶ 17 (internal quotation marks omitted).

¶ 9 We first hold that the officers impermissibly detained Mr. Baker after concluding the purpose of the initial stop, which was to investigate and then arrest the vehicle driver. We then adopt the good-faith exception to the exclusionary rule and apply it to the facts of this case, concluding that the officers reasonably relied on settled judicial precedent when they impermissibly extended Mr. Baker's detention by having the drug dog sniff the vehicle. We then consider whether the positive indication of the drug dog justified the subsequent frisk of Mr. Baker, either because it gave rise to an objectively reasonable belief on the part of law enforcement that Mr. Baker was armed and dangerous or because it gave rise to probable cause that Mr. Baker possessed illegal drugs under exigent circumstances that excused the need for a warrant. We conclude that the search of Mr. Baker's person was not justified based on grounds of officer safety because the officers lacked reasonable articulable suspicion that the passengers posed a threat to their safety at the time they conducted the patdown search of Mr. Baker. And while the drug dog sniff may have provided the officers with justification to search Mr. Baker for drugs, either because the officers had probable cause to arrest him or because exigent circumstances justified a warrantless search, the State does not raise this argument on appeal. We therefore do not address it.

## I. THE OFFICERS IMPROPERLY EXTENDED MR. BAKER'S DETENTION AFTER THEY FINISHED PROCESSING THE DRIVER'S ARREST

██ ¶ 10 The Fourth Amendment to the United States Constitution protects citizens from "unreasonable searches and seizures" of "their persons, houses, papers, and effects" by the government. U.S. Const. amend IV. "[T]he 'touchstone of the Fourth Amendment is reasonableness,'" which "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Reasonableness under the Fourth Amendment "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *State v. Warren,* 2003 UT 36, ¶ 31, 78 P.3d 590 (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

██ ¶ 11 Although police must have a warrant to conduct most searches and seizures, "officers may temporarily detain a vehicle and its occupants upon reasonable suspicion of criminal activity for the purpose of conducting a limited investigation of the suspicion." *State v. James,* 2000 UT 80, ¶ 10, 13 P.3d 576. This "automobile exception" to the warrant rule arises because occupants of a vehicle have a lesser expectation of privacy "[d]ue to the mobile nature of vehicles and their highly regulated status." *Id.* But "'one does not lose the protection of the Fourth Amendment while in an automobile.'" *State v. Lopez,* 873 P.2d 1127, 1131 (Utah 1994) (quoting *State v. Schlosser,* 774 P.2d 1132, 1135 (Utah 1989)).

██ ¶ 12 We apply a two-step test to determine whether a traffic stop is reasonable under the Fourth Amendment. *State v. Applegate,* 2008 UT 63, ¶ 9, 194 P.3d 925. "The first step is to determine whether 'the police officer's action [was] justified at its inception.' In the second step, we must determine whether the detention following the stop was 'reasonably related in scope to the circumstances that justified the interference in the first place.'" *Id.* (quoting *State v. Lopez,* 873 P.2d at 1131–32) (alternation in original); *see also Lopez,* 873 P.2d at 1134 (holding that an officer can run a warrant check on a car during a legal traffic stop if doing so does not "significantly extend[ ] the period of detention beyond that reasonably necessary to request defendant's license and registration and to issue a citation").

¶ 13 During a lawful traffic stop, "[t]he temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, ——— U.S. ———, ———, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009). If, during the scope of the traffic stop, the officer forms new reasonable articulable suspicion of criminal activity, the officer may also expediently investigate his new suspicion. *See id.* at 787. But without additional reasonable suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded. *State v. Hansen*, 2002 UT 125, ¶ 31, 63 P.3d 650; *see also State v. Bissegger*, 2003 UT App 256, ¶ 20, 76 P.3d 178 (finding that requesting permission to search a car after the driver successfully completed a field sobriety test exceeded the scope of the initial stop).

¶ 14 In this case, Officer Robertson was justified at the inception of the stop to detain the vehicle to investigate the broken taillight. *See Lopez*, 873 P.2d at 1132 ("[A] police officer is constitutionally justified in stopping a vehicle if the stop is incident to a traffic violation committed in the officers' presence." (internal quotation marks omitted)). However, the reasonableness of Mr. Baker's detention fails under the second prong. We first hold that the purpose of the stop concluded when the officers finished processing the arrest. We then hold that the drug dog sniff that occurred after the purposes of the stop had been completed violated Mr. Baker's Fourth Amendment rights.

A.  *When a Traffic Stop Culminates in the Arrest of a Vehicle Driver, the Purpose of the Stop as to the Passengers Ends When the Officers Have Finished the Activities Incident to the Arrest*

¶ 15 Mr. Baker argues that the police officers exceeded the lawful scope and duration of the stop by detaining the passengers once they had decided to arrest the driver. The State contends that police may lawfully detain passengers until all purposes of the stop have concluded. If the stop results in the arrest of the driver, they argue that passengers are lawfully detained until officers have concluded all actions incident to the arrest of the driver. We agree with the State. However, we find that the police had concluded all actions incident to the arrest of the driver when they detained Mr. Baker to await the arrival of the K–9 unit.

¶ 16 The United States Constitution permits three types of police stops:

(1) An officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an articulable suspicion that the person has committed or is about to commit a crime; however, the detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense had been committed or is being committed.

*State v. Johnson*, 805 P.2d 761, 763 (Utah 1991) (internal quotation marks omitted). Generally, the officer's level of suspicion determines the allowable level of intrusion into the privacy of the stopped individual. Under *Arizona v. Johnson*, police may constitutionally detain passengers if they have probable cause or reasonable articulable suspicion of the driver's traffic violation or other criminal activity. 129 S.Ct. at 784 (holding that when an investigatory stop is lawfully based on the suspicion of the driver's vehicular violation, "[t]he police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity"). Thus, even though an officer has no suspicion at all regarding passenger criminal activity, the officer may still detain passengers during the course of the lawful traffic stop. Police have this unique authority to detain passengers absent any suspicion because traffic stops are brief and fraught with potential danger. *Id.* at 786–87. The United States Supreme Court noted that "[t]he motivation of a passenger to employ violence to prevent apprehension of ... a crime ... is every bit as great as that of the driver." *Id.* at 787 (internal quotation marks omitted).

¶ 17 "Once a traffic stop is made, the detention 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Lopez*, 873 P.2d at

1132 (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). "[T]he stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Arizona v. Johnson*, 129 S.Ct. at 788. A court should not micromanage the details of a traffic stop to ensure that no actions of the police improperly extend the stop so long as the duration of the stop is reasonable under the totality of the circumstances. *State v. Worwood*, 2007 UT 47, ¶ 28, 164 P.3d 397 (noting that we will not engage in "judicial second-guessing" when evaluating the totality of the circumstances). There is no bright-line test that indicates an appropriate length for a traffic-stop detention; rather, we consider the totality of the circumstances surrounding the stop to determine whether the length and scope of the detention were reasonable. *Id.* For instance, officers may run a warrants check on the driver of the vehicle "so long as it does not significantly extend the period of detention beyond that reasonably necessary to request a driver's license and valid registration and to issue a citation." *Lopez*, 873 P.2d at 1133. However, we have clearly stated that once the lawful purpose of the stop has concluded, the occupants of the vehicle must be released from their temporary seizure. *Hansen*, 2002 UT 125, ¶ 31, 63 P.3d 650.

¶ 18 In this case, the court of appeals held that the detention of the passengers became illegal as soon as the arrest was made. *State v. Baker*, 2008 UT App 115, ¶ 13, 182 P.3d 935. We disagree. Once Officer Robertson discovered that the driver's license had been suspended for drugs and decided to arrest her, he could still detain the passengers while he completed any tasks incident to the arrest, including paperwork that is customarily performed at the scene. After concluding the arrest, however, Officer Robertson was required to release the passengers unless he had reasonable articulable suspicion that they were engaged in criminal activity.

¶ 19 The lawful purpose of a traffic stop that results in the arrest of the vehicle driver is complete when all procedures incident to the arrest have taken place. At that time, officers must release any passengers who were detained incident to the detention of the vehicle. We now examine whether the officers had lawful justification to extend the stop in order to conduct a search incident to arrest. We then assess whether officer safety concerns justified the continued detention of the passengers.

1. *Arizona v. Gant* Prohibits Routine Searches Incident to the Arrest of a Vehicle Occupant

¶ 20 Prior to the recent United States Supreme Court decision in *Arizona v. Gant*, —— U.S. ——, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), issued after oral arguments had been completed in this case, officers could conduct a search of the passenger compartment of a vehicle whenever the driver was arrested. *Knowles v. Iowa*, 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998); *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Although such a search was premised on protecting the safety of officers and preserving evidence of the crime, a police officer's right to conduct the search was not dependent on whether the arrestee could *actually* access the passenger compartment of the vehicle or whether the failure to search could *actually* result in the loss of evidence pertaining to the crime underlying the arrest. *Knowles*, 525 U.S. at 118, 119 S.Ct. 484. Under this framework, upon the arrest of a vehicle driver, law enforcement officers could lawfully detain vehicle occupants who were not under arrest and whom they did not suspect were involved in criminal activity until they had concluded their search of the vehicle incident to the arrest of the driver.

¶ 21 *Gant* did not overrule the *Knowles* and *Belton* line of cases, but it narrowed the situations in which officers can conduct a search incident to arrest to times "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or when the police could expect to find evidence of the offense for which the arrestee had been arrested.[1]

---

1. Because the driver of the vehicle was arrested for driving with a suspended license, the State

*Gant,* 129 S.Ct. at 1719. While the Supreme Court framed its analysis as clarifying rather than overruling its holding in *Belton,* the practical effect of *Gant* is to prohibit searches of a vehicle incident to the arrest of a vehicle occupant absent additional justification. *Id.* at 1722–23; *see also, id.* at 1724–25 (Scalia, J., concurring). Because *Gant* represents a significant break from the prior bright-line rule authorizing a vehicle search incident to arrest under all circumstances, we asked the parties to provide us with supplemental briefing as to the effect of the *Gant* ruling on this case.

▇▇▇ ¶ 22 The State argues that *Gant* does not prevent officers from conducting a search incident to arrest when some of the vehicle passengers have not been arrested because officers still have a need to control the scene. Mr. Baker contends that *Gant* prevents officers from conducting routine searches of an arrestee's vehicle and that the presence of passengers does not affect this holding. We agree with Mr. Baker. *Gant* clearly holds that absent evidence-preservation concerns, "[p]olice may search a vehicle incident to a recent occupant's arrest only if *the arrestee* is within reaching distance of the passenger compartment at the time of the search ... unless police obtain a warrant or show that another exception to the warrant requirement applies." *Id.* at 1723–24 (emphasis added). *Gant* does not limit this holding to situations where there are no passengers in the vehicle.

¶ 23 Under *Gant,* the officers in this case were not permitted to conduct a search incident to the arrest of the vehicle driver and thus had concluded the purpose of the stop when they completed processing her arrest. Both sides agree that the arrested vehicle driver did not have access to the vehicle after she was handcuffed and placed in the back of the police cruiser. And Officer Robertson's testimony makes clear that there was at least a minute delay between completion of the driver's arrest and the arrival of the K–9 unit. Prior to *Gant,* officers could have lawfully detained the passengers after process-

ing the arrest in order to conduct a search of the arrestee's vehicle regardless of actual officer safety or evidence preservation concerns. But under the new interpretation of *Belton* announced in *Gant,* the officers were required to release the passengers, including Mr. Baker, when they finished processing the arrest unless they had reasonable articulable suspicion that the passengers were engaged in or about to be engaged in criminal activity.

▇▇▇ ¶ 24 The State argues that we should not apply *Gant* retroactively because it represents a "clear break" from prior Supreme Court precedent. But *Griffith v. Kentucky* eliminated the "clear break" exception to retroactive application of newly declared constitutional rules for cases pending on direct review. 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). "[F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." *Id.* at 322, 107 S.Ct. 708. Because Mr. Baker's case is here on direct review, we are required to apply *Gant.*

2. Officer Safety Did Not Justify Continued Detention

▇▇▇ ¶ 25 The State also argues that even if the officers were not permitted to detain Mr. Baker, at the time the dog sniff occurred, the officers had reasonable articulable suspicion that he may be armed and dangerous, which meant the purposes of the stop were not complete until the officers had frisked Mr. Baker to ensure officer safety. We disagree.

▇▇▇ ¶ 26 During a lawful traffic stop, officers may conduct a pat-down search of the driver and other vehicle occupants "upon reasonable suspicion that they may be armed and dangerous." *Arizona v. Johnson,* 129 S Ct. at 787 (internal quotation marks omitted). As with all level two *Terry* stops, officers must " 'diligently pursue[ ] a means of investigation that [is] likely to confirm or dispel their suspicions quickly.' " *Worwood,* 2007

does not argue that there was any evidence-preservation justification for searching the vehi-

cle once the arrest was processed.

UT 47, ¶ 28, 164 P.3d 397 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

¶ 27 The State urges us to find that the officers' reasonable belief that Mr. Baker and his fellow passengers were armed and dangerous justified continued detention to allow the officers to conduct a search of the passengers at the time of the officers' choosing. In support of this argument, they point to the lateness of the hour and the unusual number of knives collected from the vehicle occupants. In order to determine whether the officers illegally extended the time of Mr. Baker's detention, we need not address whether these factors provided the officers with reasonable suspicion to conduct a protective pat-down search of the vehicle occupants because the officers did not conduct such a search during the lawful duration of the stop. Rather, the officers detained Mr. Baker without searching him while they waited for the K–9 unit and conducted a dog sniff of the exterior of the vehicle prior to conducting any search. Reasonable belief that an individual is armed and dangerous justifies a protective pat-down search, not an extended detention. Thus, even if the officers had a reasonable belief that Mr. Baker was armed and dangerous, they illegally prolonged his detention by not taking steps to confirm or dispel this suspicion.

### B. No De Minimis Exception Allows Officers to Conduct a Dog Sniff After the Purpose of the Stop Has Concluded

¶ 28 The State also argues that because there was only a short amount of time between the completion of the arrest of the driver and the arrival of the K–9 unit, we should hold that any extension of the detention of the passengers was de minimis. But "even a small intrusion beyond the legitimate scope of an initially lawful search is unlawful under the Fourth Amendment." *Schlosser*, 774 P.2d at 1135.

¶ 29 Because a trained narcotics-detection dog alerts police only to the presence of contraband, and there is no Fourth Amendment right to possess contraband, the United States Supreme Court has held that a dog sniff is not a search under the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Based on the premise that a dog sniff is not a search, the Supreme Court has also found that a drug-trained dog may walk the perimeter of a lawfully detained vehicle even if police have no reasonable suspicion that the vehicle occupants are engaged in drug-related activity so long as the dog sniff search does not extend the duration of the stop. *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). However, "[a] seizure ... can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407, 125 S.Ct. 834.

¶ 30 Some jurisdictions have held that because police may conduct a dog sniff of the exterior of the vehicle during the course of a lawful traffic stop, they may also detain vehicle occupants for a short amount of time after the purpose of the stop has concluded in order to conduct a dog sniff search. *See United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647–48 (8th Cir.1999) (allowing a dog sniff after the purpose of the traffic stop had concluded because a traffic stop is based on probable cause, and police have more authority than they do during a typical *Terry* stop); *Hugueley v. Dresden Police Dep't*, 469 F.Supp.2d 507, 512 (W.D.Tenn.2007) (finding that the dividing line between the end of the traffic stop and the dog sniff was artificial because police could have conducted the dog sniff prior to the conclusion of the stop); *State v. Box*, 205 Ariz. 492, 73 P.3d 623, 629 (Ct.App.2003) (adopting Eighth Circuit rule because detention of a driver who has violated a traffic law is akin to an arrest based on probable cause). *State v. De La Rosa*, 657 N.W.2d 683, 689 (S.D.2003) (allowing a dog sniff after the conclusion of a traffic stop because allowing a dog sniff only after officers informed traffic offenders that they were free to go would incentivize officers "to falsely tell traffic offenders they are free to go, only for the purpose of eliciting their uncoerced agreement to search their automobiles"). However, many jurisdictions have recognized that any extension of a stop after officers have completed the purpose of their stop violates

the Fourth Amendment. *United States v. Wood*, 106 F.3d 942, 946 (10th Cir.1997) (invalidating drug sniff that occurred after the lawful duration of the stop had concluded because there was no reasonable suspicion to detain the driver between the conclusion of the stop and the arrival of the drug dog); *People v. Brandon*, 140 P.3d 15, 19 (Colo.Ct. App.2005) (granting a motion to suppress a dog search that occurred after the purpose of the stop had concluded even though the dog was in the patrol vehicle throughout the lawful duration of the stop); *State v. Louthan*, 275 Neb. 101, 744 N.W.2d 454, 461–62 (2008) (requiring reasonable suspicion to extend a stop and explicitly rejecting the Eighth Circuit de minimis exception for dog sniffs); *cf. State v. Cunningham*, 183 Vt. 401, 954 A.2d 1290, 1296 (2008) (finding no de minimis extension of the stop permissible under Chapter I, Article 11 of the Vermont Constitution). Some courts in jurisdictions that have allowed a de minimis extension of a stop in order to conduct a dog sniff have declined to apply the de minimis rule to situations where officers had already determined to conduct an illegal search, but happened to start that search with a dog sniff which then provided probable cause for a more intrusive search. *Urioso v. State*, 910 So.2d 158, 161–62 & n. 5 (Ala.Crim.App.2005) (declining to find probable cause based on a drug sniff that occurred after officers obtained involuntary consent to search); *People v. Matthews*, 357 Ill.App.3d 1062, 294 Ill.Dec. 677, 831 N.E.2d 627, 633 (2005) ("[I]f the decision to search does not satisfy [F]ourth [A]mendment principles, the decision cannot be saved merely because [the police officer] used a dog.").

¶ 31 Although this court has never considered whether a stop can be extended for a brief period of time in order to conduct a dog sniff, we have made clear that any detention of an individual after the purpose for the initial detention has concluded violates the Fourth Amendment. Indeed, we have specifically held that an officer cannot prolong a driver's detention after concluding the purpose of the original stop without reasonable belief that the driver of the car was involved in other illegal activity. *Hansen*, 2002 UT 125, ¶ 32, 63 P.3d 650.

¶ 32 In *Hansen*, the officer pulled the driver over for an illegal lane change and lack of car insurance. *Id.* ¶¶ 6, 8. After returning the driver's license and registration and giving him a verbal warning to get insurance on his car, the officer inquired if there were drugs and alcohol in the car and asked the driver for consent to search, which he gave. *Id.* ¶¶ 12–14. We ruled that the driver's consent was the fruit of an illegal detention because the officer continued to question him after the purpose of the stop had concluded. *Id.* ¶ 32.

¶ 33 Similarly, in this case, the officers conducted the dog sniff after the lawful purposes of the stop—investigating the broken taillight and arresting the driver for driving with a suspended license—had concluded. We fail to see how detaining the occupants of the vehicle beyond the lawful purpose of the stop in order to conduct a dog sniff differs in any meaningful way from detaining occupants in order to request consent to search their car. Both a dog sniff and a consent search are legal under the Fourth Amendment only when they are performed during the course of a lawful stop. Further, in this case it appears that the officers had already determined to conduct a routine search of the vehicle incident to the arrest of the driver at the time the dog sniff occurred. Such a search is unconstitutional, and the fact that officers used a dog to initiate the search cannot cure the search's infirmities under the Fourth Amendment.

¶ 34 Having determined that the officers unlawfully detained Mr. Baker after effectuating the arrest of the driver, we now consider whether we should apply the exclusionary rule to the evidence found during the dog sniff of the car.

## II. THE OFFICERS REASONABLY RELIED ON *STATE V. BELTON* AND ITS PROGENY WHEN THEY IMPROPERLY EXTENDED THE DURATION OF THE STOP

¶ 35 The United States Supreme Court has adopted a good-faith exception to the exclusionary rule in some situations when application of the rule would not serve a

deterrent effect.[2] *Herring v. United States,* —— U.S. ——, ——, 129 S.Ct. 695, 700, 172 L.Ed.2d 496 (2009); *Illinois v. Krull,* 480 U.S. 340, 352–53, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *United States v. Leon,* 468 U.S. 897, 905–06, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). "The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring,* 129 S.Ct. at 700. Evidence should not be excluded when the application of the exclusionary rule does not deter improper police conduct or when the benefits of deterrence do not outweigh the cost. *Id.* " '[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " *Id.* at 701 (quoting *Krull,* 480 U.S. at 348–49, 107 S.Ct. 1160).

■■■ ¶ 36 A good-faith exception to the exclusionary rule exists when an officer acts in reasonable reliance on a warrant, *Leon,* 468 U.S. at 920, 104 S.Ct. 3405, in reasonable reliance on a statute later declared unconstitutional, *Krull,* 480 U.S. at 349, 107 S.Ct. 1160, or in "objectively reasonable reliance on a subsequently recalled warrant." *Herring,* 129 S.Ct. at 703. On the other hand, no good-faith exception applies when a police officer reasonably relies on an illegal subpoena issued by the state attorney general because application of the rule in such a case has a deterrent effect on the issuance of illegal subpoenas by the state's highest law enforcement official. *State v. Thompson,* 810 P.2d 415, 420 (Utah 1991) (interpreting the federal good faith exception to the exclusionary rule).

¶ 37 The officers in the case at hand reasonably relied on settled judicial precedent when they conducted the search incident to

arrest. As recently as 2004, the Supreme Court reaffirmed that the holding in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) meant that "when a police officer has made a lawful custodial arrest of an occupant of an automobile, the Fourth Amendment allows the officer to search the passenger compartment of that vehicle as a contemporaneous incident of arrest." *Thornton v. United States,* 541 U.S. 615, 617, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (allowing a search of a vehicle incident to the arrest of a "recent occupant" of that vehicle). Our court also has held that "[t]he fact of a lawful arrest, standing alone, authorizes a search." *State v. Trane,* 2002 UT 97, ¶ 23, 57 P.3d 1052 (internal quotation marks omitted) (emphasis omitted); *see also State v. Kent,* 665 P.2d 1317, 1319 (Utah 1983) (upholding search conducted incident to the arrest of a driver).

■■ ¶ 38 The United States Court of Appeals for the Ninth and the Tenth Circuits have come to opposite conclusions about whether the good-faith exception to the exclusionary rule should apply to evidence found in searches conducted in violation of *Gant. Compare United States v. Gonzalez,* 578 F.3d 1130 (9th Cir.2009), *with United States v. McCane,* 573 F.3d 1037 (10th Cir. 2009). The Ninth Circuit held that applying the good-faith exception to the exclusionary rule would amount to denying defendants retroactive application of the rule in *Gant. Gonzalez,* 578 F.3d at 1132–33. The parties in the Tenth Circuit case stipulated to retroactive application, but the court "decline[d] to apply the exclusionary rule when law enforcement officers act in objectively reasonable reliance upon the settled case law of [the jurisdiction]." *McCane,* 573 F.3d at 1045. We find the Tenth Circuit's approach more persuasive and hold that evidence obtained in

---

2. We have not had the opportunity to determine whether such an exception exists under the Utah Constitution, and we do not do so today. *See Sims v. Collection Div. of Utah State Tax Comm'n,* 841 P.2d 6, 11 n. 10 (Utah 1992); *State v. Thompson,* 810 P.2d 415, 419–20 (Utah 1991). Because no state constitutional arguments were made in this case, we limit our analysis to the federal good-faith exception. *See Brigham City v. Stuart,* 2005 UT 13, ¶ 12, 122 P.3d 506, *rev'd on other grounds,* 547 U.S. 398, 126 S.Ct. 1943, 164

L.Ed.2d 650 (2006) ("Where the parties do not raise or adequately brief state constitutional issues, our holdings become inevitably contingent. They carry within them an implicit qualification that if properly invited to intervene, our state's Declaration of Rights might change the result and impose different demands on police officers and others who in a very real sense are the everyday guardians of constitutional guarantees against unreasonable searches and seizures").

objective reasonable reliance on settled judicial precedent that is later overturned should not be excluded.

¶ 39 In this case, the officers relied on a practice deemed constitutional by both the Supreme Court and this court in order to conduct their search. Thus, admitting the evidence police found during the time when the officers reasonably believed they had not completed the lawful purpose of their stop would not serve to deter officers from unconstitutionally detaining vehicle passengers. We note that this is not a case where police interpreted an ambiguous law in their own favor. *See State v. Shoulderblade*, 905 P.2d 289, 294 (Utah 1995) (declining to apply a good-faith exception to the exclusionary rule to evidence discovered during "a suspicionless, investigatory roadblock," even though such a roadblock was not clearly unconstitutional at the time it was implemented because it would create an incentive "to violate constitutional guarantees by seizing upon an ambiguity"). If the case law had been ambiguous prior to the time the officers conducted a search later definitively declared unconstitutional, the good-faith exception would not apply and the evidence would be excluded.

■■■ ¶ 40 Having declined to apply the exclusionary rule to evidence gathered during the unconstitutional detention of Mr. Baker, we now turn to the question of whether officers could frisk him after the drug dog alerted to the presence of drugs in the vehicle, either because they believed he was armed or dangerous or because the dog sniff gave rise to probable cause that Mr. Baker was in possession of illegal drugs. We hold that the officers did not have an objectively reasonable belief that Mr. Baker may be armed and dangerous sufficient to justify a

protective frisk.[3] And because the State did not argue, either on appeal or in the district court, that the evidence obtained during the dog sniff gave rise to probable cause justifying a warrantless search for illegal drugs, we do not consider that argument.

## III. POLICE OFFICERS HAD NO REASON TO BELIEVE THAT MR. BAKER WAS ARMED AND DANGEROUS SUFFICIENT TO JUSTIFY A PAT-DOWN SEARCH

■■■ ¶ 41 "[O]fficers who conduct 'routine traffic stop[s]' may 'perform a pat-down of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.' " *Arizona v. Johnson*, — U.S. —, —, 129 S.Ct. 781, 787, 172 L.Ed.2d 694 (2009) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117–118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (second alteration in original)). Because a pat-down search is "an intrusion of greater magnitude" than a background check or ordering a driver and passengers from a car, officers may not perform a pat-down search absent reasonable articulable suspicion. *State v. Warren*, 2003 UT 36, ¶ 25, 78 P.3d 590. "[T]he only permissible objective of the . . . frisk is the discovery of weapons that may be used against the officer or others." *State v. Peterson*, 2005 UT 17, ¶ 12, 110 P.3d 699 (internal quotations omitted). A "weapons search" is valid "only if the officer reasonably believes both that the suspect is dangerous, and that he may obtain immediate control of weapons." *State v. Brake*, 2004 UT 95, ¶ 26, 103 P.3d 699. We evaluate the reasonableness of a weapons search "objectively according to the totality of the circumstances." *Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590.

**3.** Mr. Baker argues that we should strike the portion of the State's brief that mentions FBI statistics about assaults on police officers during traffic stops and a news article about a mentally imbalanced woman who shot a police officer during a traffic stop because the statistics and news article were not part of the record on appeal. However, the State is not using the statistics or news article as proof of any fact in evidence, but rather using them to bolster its claim that traffic stops are dangerous and require extra safety precautions to protect officers.

*Compare Northland Ins. Co. v. Cont'l W. Ins. Co.*, 550 N.W.2d 298, 303 (Minn.Ct.App.1996) (allowing admission of statements from another case's briefs because the information was not presented as evidence of what happened, but rather to expand the court's understanding of that judicial opinion), *with State v. Burrell*, 697 N.W.2d 579, 589 n. 1 (Minn.2005) (excluding a newspaper article introduced to support factual details of a murder victim's alleged manner of death). Accordingly, we deny Mr. Baker's motion to strike.

¶ 42 In order to determine whether a stop was reasonable, we look to whether the "specific facts ..., considered with rational inferences from those facts, reasonably warrant the intrusion." *Id.* The State argues that the presence of the knives voluntarily relinquished to the officers prior to the arrest of the driver was sufficient to give rise to reasonable articulable suspicion that Mr. Baker was armed and dangerous. The State further argues that the officers did not have to take Mr. Baker's word that he did not possess more knives or another weapon, that they could consider the drug dog's alert on the car as support that Mr. Baker was armed and dangerous, and that the court of appeals put too much weight on the officers' subjective lack of fear and unlawful actual purpose for searching the passengers.

¶ 43 We hold that when an individual voluntarily relinquishes a knife, particularly when it is just a small pocket knife, the knife alone does not give an officer automatic justification to conduct a protective frisk. Rather, we evaluate the officer's reasonable articulable suspicion under the totality of the circumstances.

*A. We Do Not Consider the Thirteen Knives Recovered From the Passengers in Isolation From the Totality of the Circumstances*

¶ 44 In considering whether police had reasonable articulable suspicion that an individual posed a threat to their safety, "[c]ourts must view the articulable facts in their totality and avoid the temptation to divide the facts and evaluate them in isolation from each other." *Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590. Thus, while the fact that a suspect turned a knife over to the police may, in some situations, create an objectively reasonable belief that the suspect is armed and dangerous, it does not create automatic authorization for officers to conduct a frisk.

¶ 45 The State argues that the circumstances in this case are indistinguishable from those justifying the weapons search in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In *Long*, police officers on late night patrol of a rural area investigated a vehicle that, after driving erratically and at excessive speeds, veered off the road and into a ditch. *Id.* at 1035, 103 S.Ct. 3469. The driver ignored the officers' initial request to produce his operator's license and registration and appeared to the officers to be under the influence of something. *Id.* at 1036, 103 S.Ct. 3469. When the driver approached his car to retrieve the information sought by the officers, they noticed a large hunting knife on the floor of the vehicle. *Id.* Because they feared for their safety, they confiscated the knife and conducted a search of the driver and the vehicle, which uncovered marijuana. *Id.* Although it is true that the driver was not searched until officers noticed the presence of the knife, the court also considered the lateness of the hour, the driver's erratic driving behavior, the driver's apparent intoxication, and the driver's failure to cooperate with simple requests as indications that the officers held a reasonable fear for their safety. *Id.* at 1050, 103 S.Ct. 3469.

¶ 46 The only commonalities between *Long* and this case are the lateness of the hour and the presence of a knife. The officers in this case did not believe that Mr. Baker was engaged in any illegal activity—in fact he was only detained incidental to the detention of the driver. The officers also reported that Mr. Baker and his fellow passengers all cooperated with the officers during their investigation. Further, the officers denied fearing for their safety. And while the officers suspected drug possession, that is not a crime for which an offender is likely armed. *See* section III. A. 2. infra.

¶ 47 We note that in this case Mr. Baker's cooperation, the officers' subjective lack of fear for their safety, and lack of suspicion that Mr. Baker was involved in a crime associated with violence mitigates the presence of the thirteen knives. As a result, we cannot conclude that the presence of the knives automatically justified a pat-down search of Mr. Baker. Taking all the facts together, we agree with the court of appeals in that the police officers in this case did not have an objectively reasonable belief that Mr. Baker was armed and dangerous sufficient to justify a frisk for weapons.

B. *The Court of Appeals Properly Considered the Officers' Subjective Belief Concerning Their Safety and the Purpose for the Pat–Down Search of Mr. Baker*

¶ 48 The State argues that the court of appeals placed undue weight on the officers' lack of subjective fear and unlawful actual purpose to conduct the pat-down search. Specifically, it argues that while the officers did not testify to being afraid, they testified that traffic stops always present safety concerns, particularly when the passengers possess knives. The State argues that the court of appeals invalidated the search because the officers had an improper purpose when conducting the search—they were looking for drugs not weapons.

¶ 49 Although a pat-down search will not be invalidated merely because the officers on the scene did not actually fear for their safety, we give "an officer's subjective factual determination based on experience and specialized training … due weight as part of the objective analysis." *Warren*, 2003 UT 36, ¶ 20, 78 P.3d 590. An officer's generalized concern about the inherent dangerousness of traffic stops does not support an objectively reasonable belief that a particular suspect detained during a traffic stop is armed and dangerous. *Id.* at ¶ 29. Additionally, an officer's "subjective understanding of the law is irrelevant." *State v. Applegate*, 2008 UT 63, ¶ 20, 194 P.3d 925.

¶ 50 As an important factor in its totality of the circumstances determination, the court of appeals noted that "all three officers [on the scene during the traffic stop] testified as to having no heightened fear for their safety." *State v. Baker*, 2008 UT App 115, ¶ 18, 182 P.3d 935. The court also mentioned that the officers were searching for drugs when they performed the search but only in the context of explaining the officers' subjective lack of fear. *Id.* When the facts that support reasonable suspicion are as tenuous as they are in this case, the fact that the officers did not actually fear for their safety can weigh heavily on the ultimate determination that there was no objective reason to believe that Mr. Baker posed a threat to their safety. The court of appeals properly took the officers' subjective lack of fear into account when evaluating the totality of the circumstances.

C. *Suspicion of Drug Possession Does Not Support Reasonable Suspicion That an Individual Is Armed and Dangerous*

¶ 51 If an officer suspects that an individual " 'has committed, was committing or was about to commit a type of crime for which the offender would likely be armed,' " the officer automatically has the right to frisk the individual to search for weapons. *State v. White*, 856 P.2d 656, 663 (Utah Ct. App.1993) (quoting Wayne R. LeFave, 3 Search and Seizure, § 9.4(a) at 506 (2d ed. 1987)). When an officer suspects an individual has committed some other type of crime, such as possession of a small amount of drugs, " 'there must be particular facts which lead the officer to believe that a suspect is armed.' " *Brake*, 2004 UT 95, ¶ 32, 103 P.3d 699 (quoting *State v. Warren*, 2001 UT App 346, ¶ 15, 37 P.3d 270).

¶ 52 Officers in this case knew that the license of the driver had been suspended for drugs and that a drug sniff had revealed the presence of narcotics in the vehicle. Thus, they had reasonable suspicion that the car's occupants, including Mr. Baker, may possess narcotics. But the suspected possession of narcotics does not logically support an objectively reasonable belief that Mr. Baker was armed and dangerous. Unless officers can point to a specific reason why suspected possession of narcotics by an individual led them to believe the individual to be armed and dangerous, their suspicion of drug possession cannot support a reasonable belief that the individual posed a threat.

D. *Considering the Totality of the Circumstances, the Officers Did Not Have an Objectively Reasonable Belief That Mr. Baker Was Armed and Dangerous*

¶ 53 We have previously applied the totality of the circumstances test in a similar situation and held that an officer did not have objectively reasonable suspicion that a detained individual posed a threat. *Warren*, 2003 UT 36, ¶ 34, 78 P.3d 590. In *Warren*, an officer observed the defendant talking to a

pedestrian through his car window in a deserted area of downtown at 4:45 a.m. and suspected that he may be involved in prostitution. *Id.* ¶ 3. However, the officer did not hear the discussion between the pedestrian and the driver and was not in a position to observe any conduct between them, such as the exchange of money. *Id.* After concluding the encounter with the pedestrian, the defendant made a lane change without signaling, so the officer pulled him over based solely on the traffic violation. *Id.* ¶ 4. The officer soon discovered that the defendant was driving on a suspended license and requested that he exit the vehicle to sign a citation. *Id.* ¶ 5. Although the officer admitted at trial that he had no reason to believe that the defendant was armed, he conducted a pat-down search and discovered drugs. *Id.* ¶ 6.

¶ 54 On appeal, we ruled that the officer did not have reasonable articulable suspicion to believe the driver was armed and dangerous. *Id.* ¶ 33. We reasoned that the pat-down search could be "supported by the inherent dangerousness of a traffic stop, the lateness of the hour, the deserted downtown location, the lie by [the defendant] regarding the status of his license, the need to impound [the defendant's] car, and [the officer's] suspicion that [the defendant] was involved in drug activity or prostitution." *Id.* ¶ 32. However, considering the totality of the circumstances, "including [the defendant's] cooperative behavior, his response that he did not have any weapons on him, his willing compliance with the order to exit his vehicle," and the officer's subjective belief that the defendant was not armed or dangerous, we concluded that the officer had no objectively reasonable belief that the defendant posed a threat to the officer's safety. *Id.* ¶¶ 32–33.

¶ 55 The frisk in this case is similar to the officer's frisk of the defendant in *Warren.* As in *Warren*, the officers' suspicion that Mr. Baker could pose a threat could be supported by the inherent dangerousness of traffic stops, the lateness of the hour, a hunch that Mr. Baker may be involved in drug-related activity, and the potential need to impound the car in which he was traveling. Additionally, Mr. Baker and the defendant in *Warren* were similarly cooperative. But unlike the

defendant in *Warren*, Mr. Baker had not told officers a verifiable lie, was suspected only of drug possession not drug trade, and was not the individual who had precipitated the initial traffic stop. The only material difference between the two cases was Mr. Baker's voluntary relinquishment of a knife, a fact mitigated by Mr. Baker's cooperation, lack of threatening behavior, and the officers' subjective lack of fear for their safety. Considering the totality of the circumstances, we find that the police did not have objective reasonable articulable suspicion to frisk Mr. Baker.

¶ 56 The court of appeals properly considered the presence of the knives as part of the totality of the circumstances and found that *"in this particular situation*, the mere presence of the knives, which had been confiscated at the time the officers decided to search the passengers, is not a 'specific and articulable fact[ ] which, taken together with the rational inferences from [that] fact[ ], would lead a reasonable person to conclude that the suspect may be armed and presently dangerous.'" *State v. Baker*, 2008 UT App 115, ¶ 17, 182 P.3d 935 (quoting *Terry v. Ohio*, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967)).

## IV. WE DO NOT ADDRESS WHETHER THE OFFICERS HAD PROBABLE CAUSE TO SEARCH MR. BAKER FOR DRUGS

¶ 57 The issue of whether a drug dog's positive indication on a vehicle gives rise to probable cause to arrest or search the passengers of that vehicle under exigent circumstances, excusing the requirement of a warrant, is an issue of first impression in this court. The drug dog's positive indication on the rear driver's side door of the vehicle may have given police probable cause to arrest the occupants of the car including Mr. Baker or to seek a search warrant. And the difficulty of obtaining a warrant in the middle of the night combined with a likelihood that Mr. Baker would destroy evidence before police could obtain a warrant could have created exigent circumstances sufficient to justify the pat-down search. *See State v. Duran*, 2007 UT 23 ¶ 7, 156 P.3d 795 (finding that "prevention of the imminent destruction of evi-

dence" can satisfy the "exigent circumstances" requirement (internal quotations marks omitted)). *State v. Rodriguez*, 2007 UT 15, ¶¶ 43–44, 156 P.3d 771 (noting that the court could consider the difficulty of obtaining a warrant in determining whether exigent circumstances justify a search, although "[t]he mere possibility of delay does not give rise to an exigency" (internal quotation marks omitted)). But the State has not argued that the officers had probable cause to search Mr. Baker for drugs. Had the State raised this argument, it may have dictated a different outcome. But where the law in this area is unsettled and we are without the benefit of adversarial briefing on the subject, we would be ill-advised to resolve this case on that basis. *See Pearson v. Pearson*, 2008 UT 24, ¶ 10 n. 8, 182 P.3d 353 (declining to consider a potentially valid argument that was not briefed or argued); *Morgan v. Quailbrook Condo. Co.*, 704 P.2d 573, 577 n. 4 (Utah 1985) (same).

## CONCLUSION

¶ 58 Because officers had finished processing the arrest of the driver and were not allowed to conduct a search incident to her arrest, we hold that they had improperly extended the duration of Mr. Baker's detention at the time the dog sniff occurred. However, we decline to apply the exclusionary rule to the evidence obtained as a result of this violation because the officers acted in good faith reliance on previous precedent that allowed them to conduct a search of the vehicle incident to arrest. But we find that the officers lacked reasonable articulable suspicion that the passengers posed a threat to their safety at the time they conducted the pat-down search of Mr. Baker. Accordingly, we affirm the decision of the court of appeals.

¶ 59 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS and Justice NEHRING concur in Justice PARRISH's opinion.