ORME, Judge (dissenting):
 

 ¶37 I respectfully dissent from the majority's assessment of the "reasonableness" of the stop, primarily because of the circumstances surrounding the criminal-history check the officer conducted on Miller. While I agree with the majority that in most instances "[a] court should not micromanage the details of a traffic stop,"
 
 State v. Baker
 
 ,
 
 2010 UT 18
 
 , ¶ 17,
 
 229 P.3d 650
 
 , there are cases where the actions of an officer raise such concern that further scrutiny of the stop is required,
 
 see
 

 Rodriguez v. United States
 
 , --- U.S. ----,
 
 135 S.Ct. 1609
 
 , 1615,
 
 191 L.Ed.2d 492
 
 (2015) (providing that the incidental checks conducted by an officer may not be performed "
 
 in a way
 
 that prolongs the stop") (emphasis added).
 
 See also
 

 Baker
 
 ,
 
 2010 UT 18
 
 , ¶ 17,
 
 229 P.3d 650
 
 ("A court should not micromanage the details of a traffic stop ...
 
 so long as the duration of the stop is reasonable under the totality of the circumstances.
 
 ") (emphasis added).
 

 ¶38 In this case, there are two causes for concern. First, Miller was stopped for going five miles above the posted speed limit, which is simply not something for which Utah drivers are pulled over when traveling on an interstate highway, in their own lane, during decent weather. And in his testimony, the officer acknowledged that he typically does not pull drivers over for such an insignificant infraction and that he actually pulled Miller over because Miller had "out-of-state plates" and such plates "are huge with drug transportation."
 
 [8]
 
 He also testified that his actions throughout the stop were driven by an intent to "gain suspicion" on Miller, raising questions about how diligent the officer was in wrapping up the issuance of a citation for the traffic offense. And second, the officer admitted
 that he "spend[s] more time" on certain stops, including running a criminal-history check on people he finds suspicious. Such admissions by an officer should, as a practical matter, trigger closer scrutiny of whether the officer deliberately acted in a manner to prolong the duration of the stop.
 

 ¶39 Here, the officer's request for a "Triple I check"
 
 [9]
 
 was based on a "suspicion"
 
 [10]
 
 that he had regarding Miller, not anything related to Miller's traffic offense or anything regarding a safety concern that arose during the stop. I agree with Miller that the officer prolonged the stop by requesting a "Triple I check" as a means to buy himself additional time to conduct the dog sniff.
 

 ¶40 Officers "may conduct certain unrelated checks during an otherwise lawful traffic stop," but they "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."
 
 Rodriguez
 
 ,
 
 135 S.Ct. at 1615
 
 . There are, to be sure, certain investigative activities unrelated to a traffic infraction that "are so common as to now be a part of [a] 'routine' " for officers during a stop, including "a records check via radio or computer regarding the criminal history of those stopped." 4 Wayne R. LaFave,
 
 Search & Seizure: A Treatise on the Fourth Amendment
 
 § 9.3(c), at 508 (5th ed. 2012). This type of inquiry "serves to identify drivers who deserve (at least in the officer's mind) more intense scrutiny,"
 
 id.
 
 at 519, and aims at "detecting evidence of ordinary criminal wrongdoing" rather than "ensuring that vehicles on the road are operated safely and responsibly,"
 
 Rodriguez
 
 ,
 
 135 S.Ct. at 1615
 
 (quotation simplified). For a relatively minor traffic infraction, a criminal history "counts for very little [in assessing guilt for the infraction], but may lead to interrogation that is intense, very invasive and extremely protracted," LaFave,
 
 Search & Seizure
 
 § 9.3(c), at 517-18 (quotation simplified), "even though the purpose of the stop had nothing to do with such prior criminal history and even though there had not yet developed any reasonable suspicion of more serious criminal activity,"
 
 id.
 
 at 518-19.
 

 ¶41 But, in certain circumstances, officer safety may justify running a criminal-history check because, "[b]y determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop."
 
 United States v. Holt
 
 ,
 
 264 F.3d 1215
 
 , 1221-22 (10th Cir. 2001) (en banc) (per curiam),
 
 abrogated on other grounds as recognized by
 

 United States v. Stewart
 
 ,
 
 473 F.3d 1265
 
 (10th Cir. 2007). Such circumstances, however, must be based on a "subjective assessment of [a] safety risk."
 
 See
 

 State v. Brake
 
 ,
 
 2004 UT 95
 
 , ¶ 24,
 
 103 P.3d 699
 
 .
 

 ¶42 In this case, officer safety was not a concern. It was a full eleven minutes into this uneventful stop before the officer requested Miller's criminal history, during which time Miller had done or said nothing to suggest he posed a threat to the officer's safety. At that point, the officer had essentially completed his citation, and it would have been more efficient, as well as safer, ultimately, for the officer to finish the last section of the citation and send Miller on his way. There was also nothing in Miller's behavior throughout those eleven minutes that suggested the officer's safety was at risk. And in his own words, the officer admitted that his only reason for requesting Miller's criminal history was to "gain suspicion," not to confirm or dispel a reasonable suspicion he had already formed or because, at the tail end of the stop, he suddenly became reasonably concerned about his safety. Because there was no officer safety or reasonable suspicion justification, the criminal-history check was "aimed at detecting evidence of ordinary criminal wrongdoing" and "detour[ed]" from the stop's mission.
 
 Rodriguez
 
 ,
 
 135 S.Ct. at 1615-16
 
 (quotation simplified).
 

 ¶43 The State suggests that, because the criminal-history check occurred simultaneously
 with the warrants check, it is merely a matter of speculation as to how much time this informational detour added to the stop. The majority accepts this view, holding that there is no evidence "that a warrants check would have been completed in less than sixty seconds."
 
 Supra
 
 ¶29. But criminal-history checks are a "somewhat time-consuming task[ ]" that "can easily add to the total length of the stop," and often "take longer to process than the usual license and warrant requests." LaFave,
 
 Search & Seizure
 
 § 9.3(c), at 517 (quotation simplified). While the length of license and warrant checks may also vary, these types of checks are typically brief, especially given that most officers have computers installed in their patrol cars that give them access to this type of data "almost instantaneous[ly]."
 
 [11]
 

 Id.
 
 at 512-13.
 
 See also
 

 id.
 
 at 508 n.155, 517.
 
 Cf.
 

 United States v. Sanders
 
 ,
 
 248 F.Supp.3d 339
 
 , 342 (D. R.I. 2017) (officer testifying that the results for a license and warrants check "came back almost instantaneously") (quotation simplified);
 
 State v. Martinez
 
 ,
 
 2017 UT 43
 
 , ¶ 21,
 
 424 P.3d 83
 
 (officer testifying that it usually takes less than five seconds to run a license and warrants check).
 

 ¶44 Even in this case, the officer testified that a criminal record check can vary from one to eight minutes, but the length depends on the time it takes a dispatcher to locate a driver's criminal history and parse through that information to find any "pertinent" information that might be helpful to the officer. For example, the officer testified that there was an instance where 47 pages of criminal history took dispatch "seven, eight minutes" to go through. Here, it took dispatch over seven minutes to report back to the officer with Miller's criminal history. Suffice it to say, a criminal-history check adds measurable time to a more routine records check, and it is therefore unreasonable for an officer, without any safety justification or reasonable suspicion of criminal wrongdoing, to burden a stop for an exceedingly minor traffic infraction with a time-consuming investigation of a driver's criminal history.
 

 ¶45 Seemingly, the officer had a hunch that Miller was engaged in criminal wrongdoing and, as he testified, he was therefore going "to spend more time on it." "In assessing whether a detention is too long in duration ... we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions
 
 quickly
 
 , during which time it was necessary to detain the defendant."
 
 United States v. Sharpe
 
 ,
 
 470 U.S. 675
 
 , 686,
 
 105 S.Ct. 1568
 
 ,
 
 84 L.Ed.2d 605
 
 (1985) (emphasis added). But nothing in the officer's actions suggests that he acted diligently to conclude the traffic stop. Rather, he acknowledged that it is his practice to deliberately prolong stops to "gain suspicion" on certain drivers, which includes requesting criminal histories as a means to "gain suspicion." He did so in this case to buy additional time to conduct the dog sniff because he had essentially finished the citation and had already conducted the license check and, in fairness, Miller should then have been sent on his way. Regardless of whether the warrants check was simultaneous to the criminal-history check, there was no purpose for requesting Miller's criminal-history check, given its timing so late in the stop, other than to extend the length of the stop.
 
 See
 

 Rodriguez
 
 ,
 
 135 S.Ct. at 1615
 
 ("An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But ... he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."). Here, the officer was not reasonably diligent in concluding the purpose for the traffic stop, and he detained Miller beyond what was necessary for the completion of a singularly minor traffic offense.
 

 ¶46 I would reverse.
 

 Such plates are also "huge" with legitimate visitors from out of state, who are far from a rarity in Utah, a state that actively positions itself as a tourist mecca.
 
 See, e.g.
 
 , Utah Office of Tourism,
 
 Calendar Year 2017-Utah TravelTrakAmerica Visitor Profile Report & Insights
 
 16 (May 2018), https://travel.utah.gov/wp-content/uploads/CY17-Utah-Report-05182018.pdf [https://perma.cc/SS39-REZK] ("Utah hosts over 19 million visitors annually.").
 

 A Triple I check refers to the "Interstate Identification Index," a "federal-state system for the exchange of criminal history records."
 
 28 C.F.R. § 20.3
 
 (m) (2018).
 

 Although the officer used the word "suspicion," he did not use the term in its Fourth Amendment sense-a "reasonable articulable suspicion" of criminality.
 
 See
 

 State v. Baker
 
 ,
 
 2010 UT 18
 
 , ¶ 13,
 
 229 P.3d 650
 
 . He used the term as meaning a feeling, guess, or hunch.
 

 In reviewing the video recording, it appears that the officer did run a license check, prior to requesting the Triple I check, which "almost instantaneously" announced that Miller's license was valid.