**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 17, 2015**

# In the Court of Appeals of Georgia

A15A1483. STATE v. HOLT.                                        JE-054C

ELLINGTON, Presiding Judge.

The State of Georgia appeals the trial court's order granting, in part, Jamie Sue Holt's motion to suppress evidence derived following her detention in Cherokee County for suspicion of driving under the influence of alcohol. For the reasons set forth below, we conclude that the trial court erred in suppressing the evidence and reverse.

"[O]n appeal from a ruling on a motion to suppress, we defer to the trial court's factual findings and credibility determinations, but review de novo the court's application of the law to the undisputed facts." (Footnote omitted.) *State v. Mosley*, 321 Ga. App. 236 (739 SE2d 106) (2013). See also *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015) ("When the facts material to a motion to suppress are

disputed, it generally is for the trial judge to resolve those disputes and determine the material facts."). Although we defer to the trial court's findings of fact and its determination of credibility, "where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." (Citation, punctuation, and footnote omitted.) *Boyd v. State*, 315 Ga. App. 256, 257 (1) (726 SE2d 746) (2012).

The evidence shows that on April 28, 2014, a Georgia State Patrol trooper was dispatched to investigate an incident in which a car sideswiped a vending machine at a Kroger gas station. After the trooper arrived at the scene at 4:44 p.m., a man told the trooper that Holt was "being a little belligerent, not acting normal, and . . . might have had something to drink."[1] The trooper approached Holt, who was pumping gas, and asked her if she had been involved in the incident. The trooper determined that Holt was not the driver of the car that hit the vending machine. However, during their conversation the trooper smelled alcohol on Holt's breath. The officer also noticed that Holt's "speech was a little off" and that she had bloodshot eyes, and she admitted to having had one or two glasses of wine and to driving to the gas station. The trooper asked Holt to walk with him to his patrol car.

---

[1] Although the officer was under the impression that the man was a Kroger employee, the evidence showed, and the trial court found, that he was a customer.

2

The trooper's patrol car-mounted video showed the trooper and Holt, at 4:51 p.m., standing in front of the patrol car. Holt submitted to an alco-sensor test, and, after several attempts, she gave a sufficient sample which tested positive for alcohol and gave a numerical result of ".124," which the trooper had Holt read aloud. The trooper told Holt that she had consumed more than a glass of wine, and to "hang out right there" in front of the patrol car. He also said that he would check her again, and indicated that if the test results went down, "maybe we'll get somebody to get you a ride."

The video showed that from 4:54 p.m. to 5:06 p.m., the trooper turned his investigation to the other driver and the incident for which he had been dispatched. Holt was shown walking on and off the screen several times, alone and without restraints, and the trooper told her to remain in front of the patrol car. At 5:05 p.m., the trooper called on his radio for another trooper. Approximately 12 minutes after the initial alco-sensor test, the trooper returned to Holt to conduct a second test. The alco-sensor test was again positive, and the numerical results were the same. The trooper instructed Holt to "hang out right here" at the patrol car, and he told Holt that, "we're going to do some more testing, but first, I gotta get this taken care of,

3

okay[?]." During the conversation Holt asked the trooper, "What's the legal limit?" and the trooper responded that it was 0.08.

The second alco-sensor test was completed at 5:07 p.m., and the trooper, while apparently on his cell phone, spoke with another trooper at 5:10 p.m. The trooper could be heard saying, "I've got two DUIs; I'll give you one of them. One alcohol, one drugs."[2] The trooper then continued his investigation into the driver who crashed into the vending machine. The video showed that the trooper conducted a field sobriety test of the other driver, placed her under arrest, and then read the implied consent rights, all of which occurred from 5:11 p.m. through 5:28 p.m according to the time stamp on the video. The trooper could then be heard discussing post-arrest issues with the other driver and, apparently, her mother, for several minutes. The trooper informed Holt at 5:38 p.m. that another trooper was on his way.

The second trooper arrived at 5:39 p. m., approximately 50 minutes after Holt was first seen on the video standing at the first trooper's police car. Within three minutes of the second trooper's arrival, the first trooper left with the other driver in his custody. Holt appeared on the second trooper's video at 5:43 p.m. The second

---

[2] Although the audio portion of the video is less than clear as to this conversation, the trial court found in its order that this is what the trooper said, and the State does not dispute this finding.

trooper completed Holt's field sobriety test by 5:48 p.m., when he took Holt into custody, and he read her the implied consent notice at 5:53 p.m.

The first trooper testified at the motion-to-suppress hearing that he conducted a portion of an horizontal gaze nystagmus test, which is a field sobriety evaluation, and that he saw sustained nystagmus at maximum deviation in Holt's eyes. The trial court found that the test was conducted off view of the video "at some point." The first trooper also testified that he turned over Holt's investigation to the second trooper because he wanted to "answer the call" for which he was initially dispatched. According to the first trooper, he believed that Holt had been drinking alcohol before driving, but he did not determine whether Holt was less safe to drive. The second trooper testified that Holt's performance on the field sobriety tests, which included the horizontal gaze nystagmus test, the walk-and-turn, and the one-leg stand, were consistent with someone who was under the influence of alcohol to the extent it was less safe to drive.

Following her arrest and subsequent accusation in the State Court of Cherokee County for the offenses of driving under the influence in violation of OCGA § 40-6-391 (a) (1) (less safe) and OCGA § 40-6-391 (a) (5) (per se), Holt moved to suppress from evidence the results of the State administered breath test, the field sobriety tests,

5

as well as any statements she made to the troopers. The trial court, after an evidentiary hearing, granted Holt's motion in part. In its order, the trial court found that Holt was under arrest at 5:10 p.m., after the first trooper told the second trooper, "I've got two DUIs, I'll give you one of them," but that the first trooper lacked probable cause for an arrest at that time. Alternatively, the trial court found, if there was probable cause for Holt's arrest at 5:10 p.m., because the implied consent warning was given 38 minutes after Holt's arrest, the results of the tests following the warning must be suppressed. And, the trial court held, following Holt's arrest at 5:10 p.m., the questioning and investigation conducted by the second trooper amounted to a custodial interrogation without a prior recitation of Holt's *Miranda*[3] rights, requiring the suppression of the results of the second trooper's investigation. Lastly, the trial court found that the length of Holt's detention was unreasonable. The trial court suppressed from evidence anything learned in the course of the investigation after 5:10 p.m., including the second trooper's observations and field investigation, Holt's agreement to implied consent testing, and the results of the ensuing tests. The State appeals from the trial court's order.

---

[3] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

6

1. We first address Holt's motion to dismiss this appeal. She argues that the State failed to comply with OCGA § 5-7-1 (a) (5),[4] which, if applicable, required the State to file its notice of appeal within two days of the trial court's order and to certify to the trial court that the appeal was not taken for delay and that the evidence was a substantial proof of material fact in the proceeding. Holt contends that the appeal was subject to this requirement because the trial court's order excludes "other evidence" for purposes of OCGA § 5-7-1 (a) (5). However, the State's appeal was from an order which excluded the results of tests for alcohol and was properly filed under OCGA § 5-7-1 (a) (4), which provides:

> An appeal may be taken by and on behalf of the State of Georgia . . . in criminal cases . . . [f]rom an order, decision, or judgment suppressing or

---

[4] OCGA § 5-7-1 (a) (5) provides that an appeal may be taken by the State in criminal cases:

> From an order, decision, or judgment excluding any other evidence to be used by the state at trial on any motion filed by the state or defendant at least 30 days prior to trial and ruled on prior to the impaneling of a jury or the defendant being put in jeopardy, whichever occurs first, if:
> (A) Notwithstanding the provisions of Code Section 5-6-38, the notice of appeal filed pursuant to this paragraph is filed within two days of such order, decision, or judgment; and
> (B) The prosecuting attorney certifies to the trial court that such appeal is not taken for purpose of delay and that the evidence is a substantial proof of a material fact in the proceeding.

excluding evidence illegally seized *or excluding the results of any test for alcohol* or drugs in the case of motions made and ruled upon prior to the impaneling of a jury or the defendant being put in jeopardy, whichever occurs first[.]

(Emphasis supplied.). See *State v. Smith*, 329 Ga. App. 646 n. 5 (765 SE2d 787) (2014) (physical precedent only) (State appealed from order suppressing the results of two sobriety tests under OCGA § 5-7-1 (a) (4)); *State v. Mosley*, 321 Ga. App. 236, 238 n. 1 (739 SE2d 106) (2013) (appeal from grant of motion to suppress field-sobriety-test results and any subsequent testimonial evidence was authorized by OCGA § 5-7-1 (a) (4)). An appeal under OCGA § 5-7-1 (a) (4) is not subject to the additional requirements set forth in OCGA § 5-7-1 (a) (5) (A) and (B). Holt's motion to dismiss the appeal is denied.

2. The State contends that the trial court erred in excluding evidence gathered after 5:10 p.m. on the basis that Holt was then under arrest and no probable cause for the arrest existed at that time. We agree.

(a) There are three general classes, or "tiers," of police-citizen encounters: "(1) verbal communications involving no coercion or detention; (2) brief stops or seizures that require reasonable suspicion; and (3) arrests, which can only be supported by probable cause." (Punctuation and footnote omitted.) *Bacallao v. State*, 307 Ga. App.

539, 540-541 (705 SE2d 307) (2011). The trial court found, and the parties do not dispute, that the police-citizen encounter between the first trooper and Holt began as a first-tier encounter which then escalated into a second-tier encounter by the time the trooper directed Holt to the front of his patrol car and she blew into the alco-sensor. Even absent probable cause, during a second-tier encounter, "an officer may stop and detain a person briefly when the officer has a particularized and objective basis for suspecting the person is involved in criminal activity." (Citation and punctuation omitted.) *State v. Hammond*, 313 Ga. App. 882, 884 (723 SE2d 89) (2012). See *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LE2d 889) (1968). Here, as the trial court noted, the first trooper had an objective basis for suspecting Holt of criminal conduct and detained her for purposes of a DUI investigation in that Holt had an odor of alcohol about her person, she admitted to drinking, her eyes were bloodshot, and she had been driving. See, e.g., *Crosby v. State*, 214 Ga. App. 753, 754-755 (449 SE2d 147) (1994) (Finding that the officer was not required to have articulable suspicion to approach appellant's stopped vehicle and talk with him, and that "once appellant rolled down his window and revealed his bloodshot eyes and the strong odor of alcohol, [the officer] had reasonable grounds to conduct an investigative inquiry to

determine whether appellant was engaged in criminal activity, e.g., driving under the influence.").

At issue is the trial court's determination that, notwithstanding that Holt was, at least in the beginning, lawfully detained for purposes of an investigatory detention, her detention was subsequently elevated to an arrest at 5:10 p.m., at which time the first trooper lacked the necessary probable cause to arrest Holt. The State does not contest the trial court's finding that the first trooper lacked probable cause to arrest Holt; rather, the State maintains that Holt remained in an investigatory detention until she was placed under arrest by the second trooper.

Although Holt was not free to leave after the officer told her to stay, "not every detention is an arrest." (Citation omitted.) *Harper v. State*, 243 Ga. App. 705, 707 (1) (534 SE2d 157) (2000). Rather,

> [t]he test for determining whether a person has been placed under custodial arrest is whether the individual was formally arrested or restrained to a degree associated with a formal arrest, not whether the police had probable cause to arrest. The test is whether a reasonable person in the suspect's position would have thought the detention would not be temporary. A trial court deciding whether to admit evidence must apply this objective test; it is the reasonable belief of an ordinary person under such circumstances, and not the subjective belief or intent of the officer, that determines whether an arrest has been effected.

10

(Citation and punctuation omitted.) *Lewis v. State*, 294 Ga. App. 607, 608 (1) (a) (669 SE2d 558) (2008). See *Christy v. State*, 315 Ga. App. 647, 652 (2) (727 SE2d 269) (2012) (accord); *State v. Norris*, 281 Ga. App. 193, 195 (635 SE2d 810) (2006) ("A third-tier arrest is . . . a full-blown custodial arrest as opposed to a temporary second-tier investigative detention"). The determination of whether a detention amounts to a custodial arrest "is a mixed question of fact and law, [and] we construe the evidence most favorably to uphold the trial court's findings and accept those findings unless they are clearly erroneous, but we independently apply the legal principles to those facts." (Citation omitted.) *Parker v. State*, 326 Ga. App. 175, 178 (2) (754 SE2d 409) (2014).

In this case, the first trooper never told Holt that she was under arrest. Holt was not handcuffed, nor placed in the first trooper's patrol car. The trial court, however, discounted the fact that the first trooper did not handcuff Holt inasmuch as the trooper did not handcuff the other driver when he arrested her. The trial court noted that Holt "had blown over the legal limit twice" before the trooper told her to stay. And, the trial court found, when at 5:10 p.m. the first trooper told the second trooper, "I've got two DUIs; I'll give you one of them," the first trooper had "vocalized what a

11

determination of the result of an investigation would be," and that "an objective person from [Holt's] vantage point" would have concluded that she was under arrest.

In its analysis, the trial court implicitly assumes that Holt was aware of actions and comments that were not specifically directed at her. For example, the trial court relies on comments that the first trooper makes to the second trooper, apparently on a cell phone, and events that involved the other driver and the first trooper. We take no issue with the trial court's conclusion that Holt would have heard and seen these things, but what Holt heard and saw was consistent with what the first trooper said to Holt before he proceeded to focus exclusively on the investigation of the other driver. The first trooper told Holt after the second alco-sensor test to "hang out," and that "we're going to do some more testing, but first, I gotta get this taken care of, okay[?]." An objective person would have understood that (1) she was not free to leave, (2) and that there would be "more testing" in the future, but (3) that the trooper was going to address another matter first – in context, the investigation of the other driver.

The conversation between the first trooper and the second trooper was not, as the trial court found, a vocalization of "what a determination of the result of an investigation would be." That one law enforcement officer told another, within the

12

hearing of Holt, that he had "I've got two DUIs, I'll give you one of them" is ambiguous and could easily mean, consistent with ongoing events, that the first trooper had two ongoing DUI investigations. No intent to arrest was communicated by the first trooper to Holt. See *State v. Dixon*, 267 Ga. App. 320, 321 (599 SE2d 284) (2004) (Where there was no evidence that officer communicated to appellant his intent to arrest before asking appellant to take an alco-sensor test, nor was he handcuffed or placed in the back of the patrol car, the trial court erred in finding appellant in custody at the time of the test and excluding his pre-arrest performance thereon.). In context, and given what the first trooper had previously told Holt, the portion of the conversation which Holt overheard would not have caused a reasonable person to conclude that her status had changed. See *State v. Pierce*, 266 Ga. App. 233, 235-236 (1) (596 SE2d 725) (2004) (An officer's comment he was going to shut the appellant's car door before "some other drunk" took the door off, in context with the other circumstances, was insufficient to cause a reasonable person to believe his detention would not be temporary.). If, as the trial court found, Holt knew that the second driver was not handcuffed when she was arrested, Holt would have also known that the second driver underwent a field sobriety test before the trooper told the other driver that she was under arrest. The first trooper did, in response to Holt's

13

specific inquiry, tell her that the "legal limit" was ".08." However, the first trooper did not tell Holt that she had been driving while over the legal limit, rather, he told her that she had consumed more than one glass of wine, and he did not comment about the numerical readings on the alco-sensor test other than indicating that if they went down between the first and second test, "maybe we'll get somebody to get you a ride."

After the officer turned to the investigation of the other driver, and she remained detained pending "more testing," Holt was not physically restrained or placed in the patrol car, and she was not told that she was going to jail. Thus, "a reasonable person would conclude that his or her freedom of action was only temporarily curtailed and that a final determination of his or her status was merely delayed." *State v. Mosley*, 321 Ga. App. at 239 (finding that appellant was not in custody at the time of his field sobriety test where, among other things, the deputy never placed appellant in handcuffs or in the back of the patrol car); *Tune v. State*, 286 Ga. App. 32, 35 (1) (648 SE2d 423) (2007) (where appellant knew that she was being investigated for DUI, and had been told that she was drunk, but was not placed in the back of a patrol car nor handcuffed, a reasonable person could conclude that her freedom of action was only temporarily curtailed); *Harper v. State*, 243 Ga. App.

14

at 706 (1) (although suspect was detained pursuant to a traffic stop and was suspected for DUI, he was not in custody when he was allowed to walk around, and was not placed in the back of a police car or handcuffed). Thus, the trial court erred in concluding that Harp was under arrest at 5:10 p.m.

(b) The trial court additionally found that the length of Holt's detention was unreasonable, and that the investigatory detention therefore ripened into an arrest. See *Grandberry v. State*, 289 Ga. App. 534, 539 (2) (658 SE2d 161) (2008) (Although the police were authorized to stop the appellant for purposes of an investigation, the length of his detention, under the circumstances, was too long to be justified as investigatory stop, and constituted an arrest.). In order to comply with the Fourth Amendment, an investigative detention "cannot be prolonged beyond the time reasonably required to fulfill the purpose of the stop." (Citation and omitted.) *Langston v. State*, 302 Ga. App. 541, 543 (691 SE2d 349) (2010). And "[t]he Fourth Amendment protects a person's right to be secure against unreasonable searches and seizures. The touchstone of the Fourth Amendment is reasonableness. Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." (Citation and punctuation omitted.) Id.

In determining

whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

(Citations and punctuation omitted.) *Randolph v. State*, 246 Ga. App. 141, 146 (3) (b) (538 SE2d 139) (2000). In assessing the length of the detention, "[n]o bright line or rigid time limitation is imposed, and the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes is to be emphasized." (Citation and punctuation omitted.) *Mallarino v. State*, 190 Ga. App. 398, 401 (2) (379 SE2d 210) (1989).

Here, Holt was detained almost an hour from the time she was directed to the front of the first trooper's patrol car to the time the second trooper completed his investigation. The trial court specifically pointed to an unjustified 30-minute delay between 5:10 p.m., when the first trooper spoke with second trooper, and the second trooper's arrival at approximately 5:40 p.m., and found the length of Holt's detention unreasonable. The evidence showed that the first trooper investigated Holt for having driven under the influence through the time he gave her the second alco-sensor test, but that his investigation was focused on the other driver thereafter. Thus, during the

16

thirty-minute period identified by the trial court, the first trooper was not investigating Holt, and her investigation resumed only upon the arrival of the second trooper. However, neither the thirty-minute delay caused by the wait for a second law enforcement officer, nor the total detention period of almost one hour, would, at least absent other considerations, have caused Holt's investigatory detention to ripen into a custodial arrest. See *DiMauro v. State*, 310 Ga. App. 526, 529 (1) (714 SE2d 105) (2011) (delay of 20 minutes caused by need to summon second officer did not transform investigative detention into a custodial arrest); *Thomas v. State*, 294 Ga. App. 108, 110 (1) (668 SE2d 540) (2008) (Where evidence showed wait for assistance from other officer lasted between a "few minutes" and "probably 40 minutes," the delay by itself did not convert investigation into custodial situation); *Harper*, 243 Ga. App. at 706 (1) (delay of up to an hour before the DUI task force officer arrived did not cause investigatory detention to ripen into an arrest); *Aldridge v. State*, 237 Ga. App. 209, 213 (3) (515 SE2d 397) (1999) (a delay of 45 to 50 minutes, wherein deputies had to wait for another deputy to arrive with an alco-sensor, and then spent time looking for consent to search forms, did not exceed bounds of investigative detention).

The first trooper testified at the motion-to-suppress hearing that he was "almost positive" that it would have been faster "overall" for him to have conducted the investigations of both drivers rather than having turned one of them over to the other trooper. And, Holt argues, the trial court's grant of the motion to suppress should be affirmed because the first trooper had the experience and capability to handle both investigations. However, accepting that the first trooper *could* have conducted both investigations to completion, and that doing so would have been faster, at least for Holt, this does not render the length of Holt's detention unreasonable. Any consideration of the totality of the circumstances must take into account that the first trooper was, without a second law enforcement officer present, faced with two suspects and two unrelated investigations. The officer elected to pursue the investigation of the other driver after Holt's second alco-sensor test, but he did so knowing that another trooper would be conducting Holt's investigation. The first trooper's video shows that, after Holt's second alco-sensor test, he was involved with the investigation, arrest, and post-arrest of the other driver through the arrival of the second trooper, who completed Holt's investigation in an expeditious manner. Under the circumstances, it was reasonable for the first trooper to call in the second trooper to conduct Holt's investigation while he pursued the unrelated investigation of the

18

other driver, and the length of Holt's detention was not so long as to be beyond the scope of a permissible investigatory detention. See, e.g., *Aldridge v. State*, 237 Ga. App. at 213 (3) (45 to 50 minute detention); *Harper*, 243 Ga. App. at 706 (1) (detention of up to an hour).

The recent decision of the United States Supreme Court in *Rodriguez v. United States*, __ U. S. __ (135 SCt 1609, 191 LE2d 492) (2015), relied on by Holt, is distinguishable. In contrast to *Rodriguez*, Holt was not detained for an additional period of time after the investigation into the initial reason for her detention had been concluded. Rather, the original purpose of the detention, to confirm or dispel whether Holt had unlawfully driven while under the influence of alcohol, remained unresolved until after the arrival of the second trooper.

For the foregoing reasons, the trial court erred in excluding evidence gathered after 5:10 p.m. on the basis that Holt was then under arrest without the necessary probable cause, and because the length of her detention was unreasonable. Rather, Holt was placed under arrest by the second trooper following completion of her field sobriety test.

3. (a) The State further contends that the trial court erred in finding that the evidence gathered after 5:10 p.m. must be excluded because the further questioning

and investigation by the second trooper amounted to custodial investigation, which required a recitation of her *Miranda* rights prior to the investigation. We agree. "As a general rule, *Miranda* warnings are not required while an investigating officer conducts preliminary questioning or field sobriety tests; however, *after* a DUI suspect is arrested, *Miranda* warnings must precede further field sobriety tests in order for evidence of the results to be admissible." (Citations omitted.) *Polizzotto v. State*, 248 Ga. App. 814, 816 (1) (547 SE2d 390) (2001). As Holt was not arrested until after the second trooper had completed the field sobriety tests, see Division 2, supra, the protections of *Miranda* were not implicated before that time.

(b) Lastly the State contends that the trial court erred in finding that, because the implied consent rights were read to Holt 38 minutes after her arrest at 5:10 p.m., without a valid reason for the delay, the results of any state-administered test must be excluded. See *Hough v. State*, 279 Ga. 711, 716 (2) (620 SE2d 380) (2005) (Finding that "a suspect who is not involved in a traffic accident resulting in serious injuries or fatalities must be under arrest before implied consent rights are read to [her]," and "where implied consent rights are not read at the time of arrest, or at a time as close in proximity to the instant of arrest as the circumstances of the individual case might warrant, the results of the state-administered test will not be admissible at trial[.]")

20

(citation and punctuation omitted). See OCGA § 40-5-55 (a). As Holt was not under arrest at 5:10 p.m., there was no requirement that the implied consent notice then be read. See *Hough v. State*, 279 Ga. at 716 (2) (a) ("[I]mplied consent is triggered at the point that the suspect is not free to leave and a reasonable person in his position would not believe that the detention is temporary, regardless of whether a 'formal arrest' has occurred."). Accordingly, the trial court erred in suppressing the results of any state-administered test on the ground that Holt's implied consent warnings were not read to her at the time of her arrest.

*Judgment reversed. Dillard and McFadden, JJ., concur.*