2017 UT App 102

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHANCE ARIC NAVARRO,
Appellant.

Opinion
No. 20150832-CA
Filed June 22, 2017

Fifth District Court, St. George Department
The Honorable John J. Walton
No. 131501328

Gary W. Pendleton, Attorney for Appellant

Sean D. Reyes, Jeanne B. Inouye, and Jeffrey S. Gray,
Attorneys for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

ROTH, Judge:

¶1     This case is about the reasonableness under the Fourth
Amendment of a warrantless vehicle search which uncovered
weapons, drugs, and drug paraphernalia. Chance Aric Navarro
appeals the district court's denial of his motion to suppress the
evidence. We affirm.

¶2     One night in August 2013, Officer Parry of the
Washington County Drug Task Force was conducting
surveillance of a St. George tire shop, trying to find a person for

whom the task force had an arrest warrant.[1] Parry never found his target, but he did watch Navarro and several others as they hung out at the shop and in its parking area. At one point, Navarro opened the front door of his SUV, and, when he did so, Parry noticed the SUV's window was darkly tinted. Parry "was very confident that the window was too dark" and "believed it was going to be a tint violation."[2]

¶3     Later, Navarro opened the SUV's rear hatch and Parry saw "what appeared to be a rifle case." The case concerned Parry because he "believed that Mr. Navarro was a felon, and he may have [had] a weapon with him."[3] Parry's belief was based on his personal involvement in a proceeding from several years earlier in which Navarro had agreed to plead guilty to felony charges.[4] Parry was also concerned that Navarro might have a gun because the drug task force had information from two sources that Navarro "was involved with the distribution of drugs," was "in possession of weapons," and "was possibly looking to shoot it out with officers . . . if he was caught."

---

1. "In reviewing the trial court's ruling on a motion to suppress evidence, we recite the relevant facts in the light most favorable to the trial court's findings." *State v. Burdick,* 2014 UT App 34, ¶ 2 n.1, 320 P.3d 55.

2. Utah law prohibits the operation of motor vehicles with windows that are tinted too darkly. Utah Code Ann. § 41-6a-1635(1) (LexisNexis Supp. 2016).

3. Utah law prohibits restricted persons, a class that includes convicted felons, from possessing dangerous weapons. Utah Code Ann. § 76-10-503 (LexisNexis Supp. 2016).

4. Unknown to Parry at the time he saw Navarro's gun case, Navarro's felony conviction had been reduced to a misdemeanor at some point after the conviction was entered.

¶4    A short time before midnight, Navarro got in his SUV and left the tire shop in a convoy with three other cars. Parry used his radio to alert other members of the task force to Navarro's presumed tint violation and to warn them to use caution dealing with him. Officers Jessop and Nutchatelli responded to the radio call and paralleled the convoy as it stopped briefly at a Wendy's restaurant. The convoy broke up in the Wendy's parking lot, with Navarro's SUV and another car driving to a nearby Denny's restaurant.

¶5    Jessop and Nutchatelli followed both cars into the Denny's parking lot and turned on their patrol car's lights to initiate a traffic stop of the vehicles. Both Navarro's SUV and the other vehicle stopped. The other driver got out of her car and headed quickly for the Denny's. Jessop and Nutchatelli, with the assistance of other officers arriving on the scene, stopped her and then approached Navarro's SUV. After a short delay, Navarro complied with officer requests to show his hands and get out of his vehicle. Navarro notified the officers that he had a knife on his belt and a firearm in the SUV; they frisked Navarro for other weapons, found none, and then placed him in handcuffs.

¶6    Around this time, Parry left his surveillance position, went to Navarro's location, and discussed the possible tint violation with him. Because none of the officers on the scene had a tint meter with them, the officers waited for one to arrive so they could confirm their suspicion that Navarro's window tint violated the statute.

¶7    While the officers were waiting for the tint meter, several other things happened. First, an officer with a computer arrived and determined that Navarro was not a felon by running a criminal history check. Second, Parry called an officer with a drug dog, who arrived shortly after the call. The dog alerted on Navarro's SUV, and the officers searched it. The search uncovered two guns, drug paraphernalia, and a substance

alleged to be methamphetamine. Eventually, a tint meter arrived and confirmed that the SUV's windows were tinted too darkly. The State charged Navarro with two counts of possession of a dangerous weapon by a restricted person,[5] possession or use of a controlled substance, possession of drug paraphernalia, and illegal window tinting.

¶8    Navarro moved to suppress the evidence of drugs and weapons on the ground that the police search of his vehicle was illegal under the Fourth Amendment to the United States Constitution. Navarro's basic argument was that the police stopped him on the pretext of a window tint violation, but they immediately detoured into an investigation for drugs and weapons without doing any of the normal activities associated with clearing a traffic stop for a tint violation. This investigatory detour, he claimed, was outside the scope of a reasonable investigation necessary to resolve the window tinting pretext, and thus was illegal under the Fourth Amendment. Navarro requested an evidentiary hearing on the issue.

¶9    At the suppression hearing, the trial court heard testimony from officers Parry, Jessop, and Nutchatelli. Much of the testimony related to the timeline of events before and during the stop, the search of Navarro's SUV, and the pretextual nature of the stop. Testimony showed that Navarro left the tire shop at 11:39 p.m. Several minutes passed before he arrived at the Denny's, where he was stopped at roughly 11:45 p.m. Parry testified that, based on his phone records, he had called for the drug dog at 12:03 a.m. and that the search of Navarro's SUV began at 12:12 a.m. after the dog alerted to the possible presence of drugs. No officer was able to remember when the tint meter

_____

5. Although Navarro was not a felon when the police stopped him, Utah law prohibits any "unlawful user of a controlled substance" from possessing a firearm. Utah Code Ann. § 76-10-503(1)(b)(iii) (LexisNexis Supp. 2016).

was requested or who requested it, but Nutchatelli testified that he had been informed that Parry "was going to get ahold of a St. George police officer" to bring a tint meter before the stop began. Parry testified that he did not remember requesting the meter, but "[i]t very well could have been me. It would make sense."

¶10    Likewise, no officer could pinpoint when the tint meter arrived in relation to the drug dog. Parry testified that the meter arrived sometime between the initiation of the stop at 11:45 p.m. and the beginning of the vehicle search at 12:12 a.m., although he could not say whether the dog or the meter arrived first. Jessop testified that "[he] would guess" the dog arrived "less than five minutes" after Navarro was stopped. He also estimated that it took "20 minutes" "from the time we made contact [with Navarro] to when [the tint meter] arrived on scene and we confirmed the tint." Because his "attention was drawn away" by the other stopped vehicle, Nutchatelli was not sure how long after the initial stop it took for the drug dog to arrive, but he thought it was "[l]ess than 15 minutes." He estimated the tint meter arrived "within 20 minutes" of the stop.

¶11    At the close of the hearing, the trial court described how it had weighed the evidence presented:

> There appeared to be reasonable suspicion of a tint violation; that a tint meter was requested; that it arrived probably in the neighborhood of 20 minutes after the stop; that the drug dog arrived in the neighborhood of probably 10 or 15 minutes after the stop. [The dog] did sniff [Navarro's SUV] prior to the time the tint meter got there.

¶12    Both parties submitted briefing after the suppression hearing, and the court thereafter denied the motion to suppress in a brief written decision:

> The Court finds that the stop of [Navarro's] vehicle for a window tint violation was constitutional at its inception. The Court further finds that both a tint meter and a K-9 unit were requested shortly after the stop, and that the tint meter did not arrive until after the arrival of the K-9 unit. Once the K-9 alerted on the defendant's vehicle, the detectives had reasonable suspicion of additional serious criminal activity, and could appropriately expand the investigative scope of the initial stop.

¶13    The case proceeded to trial and a jury convicted Navarro on two counts of possession of a dangerous weapon by a restricted person and possession of drug paraphernalia.[6] Navarro timely appealed.

¶14    According to Navarro, the "only issue on appeal" is whether, under the Fourth Amendment to the United States Constitution, "the district court erred in denying [his] motion to suppress evidence" found during the search of his vehicle. "We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. "While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *Id.*

¶15    Navarro concedes that the traffic stop of his SUV was justified at its inception based on the officers' reasonable suspicion of an equipment violation, namely the dark tinting of his windows. He contends, however, that the police

---

6. The trial court dismissed the charge of possession of a controlled substance because the State failed to test the alleged methamphetamine in time for trial. The window tinting charge was apparently also dismissed.

"impermissibly exploited the traffic stop" by immediately "embarking upon [a] narcotics investigation" that was unrelated to the purpose of the stop. Because it was unrelated to the suspected equipment violation that justified the stop, he claims the narcotics investigation exceeded the bounds of the Fourth Amendment and the evidence uncovered should have been suppressed under *State v. Lopez*, 873 P.2d 1127 (Utah 1994). Under *Lopez*, both "the length and the scope of the detention must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Id.* at 1132 (brackets, citation, and internal quotation marks omitted).

¶16    Given that Navarro concedes the stop's initial validity, the only question presented on appeal is "whether the detention following the stop was reasonably related in scope to the circumstances that justified the interference in the first place." *See State v. Baker*, 2010 UT 18, ¶ 12, 229 P.3d 650 (citation and internal quotation marks omitted). On that question, Navarro argues that the "evidence that the State offered" "does not demonstrate that officers took any measures to clear the traffic stop before concluding their narcotics investigation." (Emphasis omitted.) Navarro also argues that the "police did not have reasonable suspicion to initiate a stop or extend [his] detention for the purpose of investigating a weapons violation." In essence, Navarro asserts that the police unreasonably extended his detention by not immediately taking steps to resolve the suspected tint violation and that no other circumstance—such as suspicion of a separate weapons violation—justified the police delay. We conclude, however, that the totality of the circumstances of this case, including police efforts to investigate Navarro for a potential weapons violation, must be taken into account in determining whether the actions of law enforcement violated Navarro's constitutional rights. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (stating that "the touchstone of the Fourth Amendment is reasonableness," which "is measured in objective

terms by examining the totality of the circumstances" (citation and internal quotation marks omitted)).

¶17    "During a lawful traffic stop, the temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Baker*, 2010 UT 18, ¶ 13 (brackets, citation, and internal quotation marks omitted). "If, during the scope of the traffic stop, the officer forms new reasonable articulable suspicion of criminal activity, the officer may also expediently investigate his new suspicion." *Id.* "Reasonable suspicion means suspicion based on specific, articulable facts drawn from the totality of the circumstances facing the officer at the time of the stop," *Lopez*, 873 P.2d at 1132, which facts "are most frequently based on an investigating officer's own observations and inferences," *State v. Roybal*, 2010 UT 34, ¶ 14, 232 P.3d 1016 (citation and internal quotation marks omitted). "If reasonable suspicion of more serious criminal activity does arise, the scope of the stop is still limited. The officers must diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly, during which time it is necessary to detain the defendant." *Lopez*, 873 P.2d at 1132 (brackets, citation, and internal quotation marks omitted).

¶18    In this case, the record shows that Parry believed, based on his personal knowledge, that Navarro had pleaded guilty to a felony in the past. Parry also saw the rifle case in the back of Navarro's SUV. Because Utah law prohibits felons from possessing firearms, the State argues that Parry had independent reasonable suspicion to investigate Navarro for a possible weapons violation. The State asserts that this is so even though Navarro was not in fact a felon—and therefore not a restricted person—at the time of the stop, having had his felony conviction reduced to a misdemeanor.

¶19    Navarro relies on *State v. Houston* to argue that an officer's unaided memory alone is not sufficient to give rise to reasonable suspicion that a suspect is a convicted felon. 2011 UT App 350,

263 P.3d 1226. In *Houston*, we determined that reasonable suspicion existed to stop a driver for operating under a suspended license based on the officer's personal knowledge that the driver's license had been suspended in the past, which knowledge the officer had confirmed "just a few days before" the stop. *Id.* ¶¶ 2, 21–22. But license suspensions are by their nature temporary, whereas felony convictions are not. Thus, while our determination in *Houston* relied on the officer's recent verification of the defendant's driver license status, that does not imply that an officer must always verify his or her memory before it can give rise to reasonable suspicion. Rather, unlike the driver license suspension in *Houston*, felony convictions are generally permanent absent further judicial process. *See* Utah Code Ann. § 76-3-402 (LexisNexis 2012) (setting forth the procedure for reducing the severity of a conviction); *id.* § 77-40-103 (LexisNexis Supp. 2016) (explaining the "process for the expungement of [criminal] records"). Given that the "standard for reasonable suspicion is relatively low" and "falls considerably short of satisfying a preponderance of the evidence standard," *State v. Morris*, 2011 UT 40, ¶ 29, 259 P.3d 116 (citation and internal quotation marks omitted), we conclude that Parry had reasonable suspicion to investigate whether Navarro was a restricted person in this case.

¶20 Once the officers who stopped Navarro for the tint violation informed Parry they had done so, Parry left his position near the tire shop and arrived at the scene of the traffic stop "within a few minutes." And Parry's reasonable suspicion of a weapons violation traveled with him. That is, Parry brought to the scene of the stop independent reasonable suspicion that Navarro was a restricted person in possession of a firearm. Contrary to Navarro's argument, Parry's arrival at the Denny's parking lot justified an extension of the traffic stop for the purpose of investigating a possible weapons violation. *See Baker*, 2010 UT 18, ¶ 13 ("If, during the scope of the traffic stop, the officer forms new reasonable articulable suspicion of criminal

activity, the officer may also expediently investigate his new suspicion.").

¶21    We now turn to the core question of whether the totality of Navarro's detention was reasonable under the Fourth Amendment. "Though officers are not required to move at top speed" during a lawful detention, "the officer's overall course of action during a traffic stop, viewed objectively and in its totality, must be reasonably directed toward the proper ends of the stop." *State v. Simons*, 2013 UT 3, ¶ 33, 296 P.3d 721 (brackets, ellipses, citation, and internal quotation marks omitted); *see also id.* ¶ 34 ("The analysis of whether an officer diligently pursued the original purpose of a stop is necessarily a fact-bound inquiry.").

¶22    The record reveals that the trial court heard uncontroverted evidence about many of the events and circumstances that comprised the totality of the circumstances in this case. Navarro's SUV was stopped, along with another car which had been travelling with him from the tire shop. The driver of the other car, by immediately attempting to leave the scene after stopping, diverted police attention briefly before they focused their attention on Navarro. Once the officers talked with Navarro, he told them that he had a knife on his person, as well as a firearm in his car. That information raised reasonable concerns for officer safety and led to a weapons frisk of Navarro, with the police eventually placing him in handcuffs for their safety.

¶23    None of the original officers at the stop had a tint meter on hand. An officer therefore arranged for one to be brought to the scene to test the window so that the police would "actually have some evidence of what the window tint was." While they were waiting for the tint meter, Officer Parry arrived at the scene. His arrival brought with it the independent reasonable suspicion of a weapons violation that we discussed above. However, none of the officers had a computer when Parry

arrived, so they could not confirm or dispel Parry's suspicion that Navarro was a felon in possession of a firearm until another officer arrived with a laptop computer. Once the computer arrived, officers dispelled the suspicion that Navarro was a restricted person by running a felony records check. And then at 12:03 a.m., and still waiting for the tint meter to arrive, Parry called for a drug dog. The dog quickly arrived, alerted to the presence of drugs, and the police then searched the SUV.

¶24 After weighing the evidence, the trial court found that the tint meter did not arrive until after the drug dog, and Navarro has not challenged that finding. The court then concluded that, once the dog alerted on Navarro's SUV, the officers had "reasonable suspicion of additional serious criminal activity, and could appropriately expand the investigative scope of the initial stop" with a search of Navarro's SUV. Though not directly stated in its written order, the court implicitly determined that the scope of the initial detention—the time leading up to the search of Navarro's car—was also reasonable under the Fourth Amendment. That is, for the court to have reached its ultimate determination that the expanded investigation—here, the search—was constitutionally permissible, it necessarily had to first determine that the original detention was constitutionally reasonable as well.

¶25 Given the record before us, we do not agree with Navarro that the trial court erred as a matter of law when it implicitly determined that the length of his detention was reasonable under the Fourth Amendment. Navarro was stopped at 11:45 p.m. and arrested at some time around 12:12 a.m. The duration of Navarro's detention, which lasted a total of approximately 27 minutes, is not a facially unreasonable length of time for an investigatory detention of this sort, *see State v. Holt*, 780 S.E.2d 44, 51 (Ga. Ct. App. 2015) (determining that "neither the thirty-minute delay caused by the wait for a second law enforcement officer, nor the total detention period of almost one hour"

exceeded the boundaries of an investigatory stop), and Navarro has not directed our attention to caselaw showing otherwise.

¶26   And the totality of the circumstances support the conclusion that the length of the detention in this case was reasonable. In addition to the time required for a tint meter to arrive, several concerns reasonably complicated the police investigation in this case. First, given their knowledge that Navarro might want to "shoot it out" with police, officers were wary of him and took steps to protect themselves. *See State v. Gurule*, 2013 UT 58, ¶ 29, 321 P.3d 1039 ("[T]he inherent dangerousness of all traffic stops should be considered under the totality of the circumstances analysis." (ellipsis, citation, and internal quotation marks omitted)). Second, an officer testified that the car that had been travelling with Navarro and was also stopped at the scene distracted him: "part of it [the circumstances around Navarro's detention] was there was another vehicle [there], and I was kind of dealing with that person, and then kind of flip-flopping back and forth from Mr. Navarro to the other person that was there on the scene." Third, Parry had independent reasonable suspicion to investigate Navarro for a weapons violation. Because a weapons violation poses a unique risk to law enforcement, efforts to confirm or dispel that suspicion provided reasonable justification for an investigatory detour that, for a time, pulled officers away from their original mission of investigating the suspected tint violation.

¶27   While we recognize that the record evidence could have been more precise in terms of the sequence and relationship of events, we also note that the United States Supreme Court has warned that appellate judges engaging in post hoc evaluations can "almost always imagine" some way the police investigation could "have been accomplished by less intrusive means." *See United States v. Sharpe*, 470 U.S. 675, 686–87 (1985) (citation and internal quotation marks omitted). "But the fact that the protection of the public might, in the abstract, have been

accomplished by less intrusive means does not, itself, render the search unreasonable." *Id.* Here as well appellate hindsight might tempt us to parse the details of the stop in a way that the practical realities of police work in a situation such as this do not justify. But given the Supreme Court's admonition and the complicated nature of the traffic stop at issue here, we conclude that the duration of Navarro's detention was reasonable and the "overall course of [police] action" was "reasonably directed toward the proper ends of the stop." *See State v. Simons*, 2013 UT 3, ¶ 33, 296 P.3d 721 (citation and internal quotation marks omitted).

¶28 Finally, we address Navarro's remaining argument that one of the trial court's findings—that both the tint meter and the drug dog "were requested shortly after the stop"—was not supported by the evidence. We agree. No evidence was submitted at the suppression hearing that could support a finding that the meter was requested after the police stopped Navarro. However, the record contains evidence that the meter was requested *before* the stop began: Nutchatelli testified, "It was before we made the traffic stop that Parry was going to get ahold of a St. George police officer" to bring a tint meter. Thus, while the trial court's precise finding on this point is unsupported, the error does not support Navarro's argument that officers ignored the suspected tint violation so they could pursue a drug investigation. Rather, that evidence supports the inference that the police diligently pursued the initial purpose of the stop by making arrangements for a tint meter before Navarro was even detained.

¶29 For these reasons, the trial court correctly determined that the stop, detention, and search of Navarro's SUV were constitutional. Because the detention and search were legal, the court properly admitted evidence gathered during the search. Affirmed.

————